IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Michelle Highland, | ) | C/A No.: 1:13-2923-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

     This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On June 17, 2010, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on January 14, 2010.  Tr. at 103.  Her applications were denied initially and upon reconsideration.  Tr. at 108–12, 119–22.  On April 19, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Robert C. Allen.  Tr. at 29–53 (Hr'g Tr.).  The ALJ issued an unfavorable decision on June 18, 2012, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 6–21.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 25, 2013.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 42 years old at the time of the hearing.  Tr. at 49.  She completed high school.  Tr. at 31.  Her past relevant work ("PRW") was as a deli clerk, office clerk, cashier, mobile home park manager, and nanny.  Tr. at 48.  She alleges she has been unable to work since January 14, 2010.  Tr. at 30.

2.    Medical History

On October 21, 2009, Plaintiff presented to MCG Health complaining of neck and back pain following a motor vehicle accident.  Tr. at 244.  She was diagnosed with cervical strain and lumbar muscle spasm.  Tr. at 245.

On December 23, 2009, Plaintiff again presented to MCG Health complaining of pain in her neck, shoulder, and low back following a motor vehicle accident.  Tr. at 66.

Plaintiff was hospitalized at MCG Health from January 15–22, 2010, after being ejected from a motor vehicle during a collision.  Tr. at 256.  Plaintiff's injuries included traumatic brain injury with brief loss of consciousness; left rib fractures, T6–10; left L1 transverse process fracture; left T6 and T7 laminal fractures; right T9 transverse process fracture; left foot avulsion fracture; left foot 20 centimeter laceration; coccygeal fracture; bilateral pulmonary contusions; and left knee ligamentous injury.  Tr. at 258–59.  MRI of Plaintiff's left knee indicated tears of the anterior cruciate ligament ("ACL") and the medial collateral ligament ("MCL") with an avulsion fracture of the lateral tibial plateau.  Tr. at 288–89.  MRI of Plaintiff's cervical spine indicated severe segmental spinal canal tendon stenosis at C3-4, C4-5, and C5-6 with cord flattening.  Tr. at 289–90.

On February 1, 2010, Plaintiff presented to Shahram Bozorgnia, M.D., in the orthopedic trauma clinic.  Tr. at 293.  Plaintiff complained of persistent pain and was nonweightbearing.  *Id.*  Dr. Bozorgnia observed mild edema to Plaintiff's left knee and left foot; tenderness to palpation in the left knee, along the medial and lateral aspects of the tibial plateau; limited range of motion of the left knee; tenderness to palpation on the heel of the left foot; full range of motion of the ankle; and normal varus stress test, posterior drawer, and Lachman's test.  Tr. at 294.  Dr. Bozorgnia communicated to Plaintiff that she did not need surgery for the tibial plateau fracture, but he instructed her that she should follow up with the sports medicine clinic regarding her MCL and ACL injuries.  Tr. at 295.

3

On February 1, 2010, Plaintiff presented to David M. Hunter, M.D., for an initial visit to the sports medicine clinic. Tr. at 251. Plaintiff was noted to be on crutches and she complained of pain. *Id.* Plaintiff had moderate left knee effusion and guarding to range of motion of her left knee. Tr. at 252. She had a positive Lachman's test and medial and lateral joint line tenderness to palpation. *Id.* Dr. Hunter assessed a complete traumatic ACL rupture and partial MCL rupture. *Id.* He prescribed a hinged knee brace and referred Plaintiff for physical therapy. *Id.*

Plaintiff followed up with Dr. Hunter on February 15, 2010. Tr. at 240–41. Plaintiff reported that she had started putting 10 to 15 pounds of weight on the left lower extremity and that her knee pain was gradually improving. Tr. at 240. Her knee range of motion was 0 to 90–95 degrees. *Id.* She had some tenderness to palpation over the MCL at the insertion of the femoral condyle. *Id.*

On March 8, 2010, Plaintiff followed up in the neurosurgery clinic at MCG Health regarding neck pain. Tr. at 372. Plaintiff reported intermittent, nonradiating neck pain. *Id.* She also reported mild urinary stress incontinence when coughing and pain over her sacral coccygeal area with numbness in her right gluteal area. *Id.* She was scheduled for x-rays and MRI of the sacral coccyx area and was instructed to follow up as needed. Tr. at 372–73. X-ray of Plaintiff's sacral coccyx indicated significant degenerative changes at L5-S1 and pronounced levoscoliosis and anterior positioning at the sacrococcygeal junction. Tr. at 376. X-ray of Plaintiff's cervical spine indicated only mild degenerative changes to her lower cervical spine. Tr. at 377.

MRI of Plaintiff's lumbar spine on March 17, 2010, indicated mild subacute compression fracture deformities along the superior endplates of L1, T12, and T11 eccentric on the left; previous fracture line through the sacrum; focal areas of signal alteration that may represent numerous vertebral and sacral hemangiomas; mild bilateral L5-S1 and left L4-5 foraminal stenosis; an element of epidural lipomatosis in the canal at L5-S1; and a poorly demonstrated prior comminuted fracture of the coccyx.  Tr. at 430–31.

Plaintiff followed up with Dr. Bozorgnia on April 12, 2010, for evaluation of left tibial plateau fracture.  Tr. at 350.  Dr. Bozorgnia indicated that Plaintiff was weightbearing with no significant complaints.  *Id.*  Plaintiff complained of left medial heel pain when ambulating.  *Id.*  Dr. Bozorgnia indicated that the laceration to Plaintiff's left heel was well-healed.  *Id.*  Radiographs of the left knee demonstrated healing lateral tibial plateau fracture.  Tr. at 351.  Plaintiff was instructed to continue weightbearing as tolerated, to continue physical therapy, and to follow up to Dr. Hunter for her MCL and ACL injuries.  *Id.*

On April 26, 2010, Plaintiff followed up with Dr. Hunter and complained of knee instability.  Tr. at 348.  Plaintiff was tender to palpation over the MCL and diffusely tender to palpation over the medial compartment and medial joint line.  *Id.*  She had slightly positive Lachman's sign, negative posterior drawer, and was open to valgus stress medially at 30 degrees.  *Id.*  Plaintiff discussed surgical options with Dr. Hunter and decided to proceed with ACL reconstruction and medial meniscal debridement.  *Id.*

On May 13, 2010, Plaintiff underwent left arthroscopically assisted ACL reconstruction.  Tr. at 327.

Plaintiff presented to Dr. Hunter for her first post-operative follow up on May 19, 2010.  Tr. at 318.  She indicated that she was doing well and she had no specific problems or complaints.  *Id.*  She had minimal effusion and full extension of her knee.  She was nontender to palpation and her distal motor and sensory examination was intact.  *Id.*

On May 26, 2010, Plaintiff reported to Dr. Hunter for follow up.  Tr. at 316.  She was noted to be progressing well and to have no specific problems or complaints.  *Id.*  Dr. Hunter noted that Plaintiff had full extension and that her flexion was back to approximately 90 degrees.  *Id.*

Plaintiff followed up with Dr. Hunter on June 11, 2010.  Tr. at 314.  Dr. Hunter indicated that Plaintiff was continuing with physical therapy and was doing well overall.  *Id.*

A physical therapy progress note dated July 28, 2010, indicated that Plaintiff ambulated independently into the clinic.  Tr. at 385.  Prior to that date, she had ambulated into the clinic with a hinged knee sleeve on her left knee.  Tr. at 386–95.

On August 13, 2010, Plaintiff again follow up with Dr. Hunter, who indicated that she was making good progress in therapy and had no specific problems or complaints.  Tr. at 362.  Dr. Hunter observed that Plaintiff had a well-healed surgical wound on her left knee; that she had no effusion; that she had full range of motion; that her Lachman's

sign was negative; and that her distal motor and sensory exam was intact. *Id.* She was instructed to continue physical therapy and to follow up in three months. *Id.*

On August 30, 2010, Plaintiff presented to John C. Whitley, III, for a psychological consultative evaluation. Tr. at 499–502. Plaintiff indicated to Dr. Whitley that she experienced chronic pain in her back and tailbone and that her medication made her drowsy. Tr. at 500. Plaintiff reported that she experienced panic symptoms when in stores. *Id.* She reported intrusive and racing thoughts. *Id.* Plaintiff reported symptoms of depression. *Id.* Dr. Whitley observed that Plaintiff's concentration and memory were grossly intact and that her thought processing was logical, linear, and adequate in regard to production. Tr. at 501. Dr. Whitley assessed adjustment disorder with depressed mood and assessed a Global Assessment of Functioning ("GAF") score[1] of 60. *Id.* Dr. Whitley noted that Plaintiff was on crutches and appeared to be in pain. Tr. at 502. He indicated that Plaintiff could understand and follow multi-step instructions, but that "her current level of pain and depression may have an impact on her ability to sustain and focus for the timely completion of the task." *Id.* Dr. Whitley indicated that Plaintiff could appropriately communicate with others in a work setting, but that she may have difficulty using adequate judgment when under excessive demands and expectations. *Id.*

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

On September 28, 2010, Olin Hamrick, Jr., Ph.D., completed a psychiatric review technique in which he considered Listings 12.04 and 12.06. Tr. at 513–26. Dr. Hamrick indicated that Plaintiff's psychiatric impairments included adjustment disorder with depression and complaints of anxiety/panic. Tr. at 516, 518. He concluded that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. Tr. at 523.

State agency medical consultant Lindsey Crumlin, M.D., completed a physical residual functional capacity assessment on September 30, 2010, in which she indicated that Plaintiff was limited as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull unlimited; occasionally climbing ramp/stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladder/rope/scaffolds. Tr. at 527–34.

Plaintiff followed up with Dr. Hunter on November 15, 2010. Tr. at 574. She reported that she was overall happy and doing well with therapy. *Id.* Dr. Hunter observed no left knee effusion; range of motion of 0 to 120 degrees without pain; negative Lachman's sign; knee stable to varus and valgus stress; mild atrophy of Plaintiff's left quad; intact motor and sensory exam; and warm and well perfused foot. *Id.*

Plaintiff presented to establish care with Russ R. Ayers, M.D., on December 6, 2010, and complaining of anxiety/panic attacks and depression. Tr. at 584–86. She reported panic attacks occurring three to four times daily and passive suicidal thoughts. Tr. at 584. Dr. Ayers noted no abnormalities on physical examination. Tr. at 585. He assessed depression with anxiety, PTSD, hypertension, hypothyroidism, and gout. Tr. at 585–86. He prescribed Paxil, Vistaril, and Metoprolol and discontinued Prozac, Alprazolam, and Diovan. Tr. at 586. He referred Plaintiff to Serenity Mental Health. *Id.*

Plaintiff underwent initial clinical assessment at Aiken-Barnwell Mental Health Center on December 15, 2010. Tr. at 588–92. Plaintiff indicated that her motor vehicle accident activated past memories of sexual, emotional, and physical abuse and trauma. Tr. at 588. Plaintiff's mental status examination was normal, except for the following: anxious and depressed affect; ideas of worthlessness, paranoia, and hopelessness; poor decision making adversely affecting herself and others; acknowledging, but failing to understand her problems; poor immediate and recent memory; and easy distraction. Tr. at 590–91. Plaintiff reported sleep disturbance that included early awakening, short sleep intervals, and insomnia. Tr. at 591. She also reported decreased energy. *Id.* Harry T. Douglas assessed a GAF score of 60. *Id.*

On January 24, 2011, Plaintiff presented to Grant J. Scarborough, M.D., to follow up regarding depression, PTSD, and hypertension. Tr. at 582–83. She reported that her mood had significantly improved with fewer flashbacks and panic attacks after starting Paxil the previous month. Tr. at 582. Plaintiff reported that her plantar fasciitis was improved with steroid injections and limiting her mobility. *Id.* Dr. Scarborough

observed no abnormalities on examination of Plaintiff's back, but he did note that Plaintiff had limited range of motion and limited dorsal flexion of the left knee.  Tr. at 583.

On February 18, 2011, Plaintiff presented to Dr. Ayers, complaining of foot pain and indicating that Allupurinol, which was prescribed prior to December 2010, was not helping and that she did not think she had gout.  Tr. at 580–81.  Dr. Ayers noted tenderness to palpation in Plaintiff's bilateral heels that was worse with dorsiflexion.  Tr. at 581.  Dr. Ayers assessed pain in limb and plantar fascial fibromatosis.  *Id.*

Plaintiff presented to Prentis R. Gunter, M.D., on March 8, 2011, for psychiatric treatment.  Tr. at 596–97.  Plaintiff reported panic attack and nightmares since her motor vehicle accident.  Tr. at 596.  Dr. Gunter assessed posttraumatic stress disorder and major depressive disorder, recurrent, severe with psychotic features.  Tr. at 597.  Dr. Gunter assessed a GAF score of 55.  *Id.*  Plaintiff was scheduled to attend an appointment with Dr. Gunter on April 5, 2011, but the record reflects that she did not show up for the appointment and the record reflects no additional mental health treatment.  Tr. at 598–99.

On April 15, 2011, Darla Mullaney, M.D., completed a physical residual functional capacity assessment in which she indicated that Plaintiff was limited as follows:  occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull limited to occasional in left lower extremity; occasionally climbing

ramp/stairs, balancing, and stooping; and never climbing ladder/rope/scaffolds, kneeling, crouching, or crawling.  Tr. at 602–09.

Anna P. Williams, Ph.D., completed a psychiatric review technique on April 19, 2011, in which she considered Plaintiff's mental impairments under Listings 12.04 and 12.06.  Tr. at 610.  Dr. Williams indicated that Plaintiff had major depressive disorder and PTSD.  Tr. at 613, 615.  She concluded that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 620.  Dr. Williams also completed a mental residual functional capacity assessment in which she indicated that Plaintiff was moderately limited with respect to the following: the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. at 625. Dr. Williams further indicated the following:

> Secondary to clmt's mental condition documented in the PRTF, she may have difficulty sustaining her concentration and pace on complex tasks. However, she should be able to attend to and perform tasks without special supervision.  She can attend work regularly, but may miss an occasional day due to her mental condition.  She can relate appropriately to supervisors and co-workers.  She can make work-related decisions and occupational adjustments, adhere to basic standards for hygiene and behavior, protect herself from normal work-place safety hazards and use public transportation.

Tr. at 626.

C.     The Administrative Proceedings

    1.     The Administrative Hearing

        a.     Plaintiff's Testimony

At the hearing on April 19, 2012, Plaintiff testified that she underwent reconstructive surgery on her knee and participated in physical therapy, but that she continued to have problems with her knee.  Tr. at 32.  She indicated that she had discussed with a neurologist the option to undergo surgery for cracked vertebrae, but that she had decided not to proceed with surgery at that time.  *Id.*

Plaintiff testified that she broke her tailbone in three places when she was thrown out of a truck.  Tr. at 33.  She indicated that she continued to have pain in her tailbone that was exacerbated by sitting for long periods.  *Id.*  She indicated that she carried a pillow that she used when sitting on hard surfaces.  *Id.*

Plaintiff testified that she continued to experience numbness in her left heel from the laceration that she sustained in the motor vehicle accident.  Tr. at 33–34.  She also testified that she had plantar fasciitis in her bilateral feet.  Tr. at 34.

Plaintiff testified that she could sit for 15 to 20 minutes, but that she then needed to stand.  Tr. at 35.  She indicated that she needed to lie in a flat position in bed for 12 to 15 hours per day.  *Id.*  Plaintiff testified that her symptoms of depression and panic attacks had become more frequent since her motor vehicle accident.  Tr. at 37.

Plaintiff testified that she took multiple medications following her accident and she indicated that the side effects of those medications included sleepiness, drowsiness,

dizziness, and frequent urination.  Tr. at 39.  She indicated that side effects of her current medications included dizziness, dry mouth, and sleepiness.  *Id.*

Plaintiff testified that she experienced three to four panic attacks per week and that they lasted for 30 minutes to one hour at a time.  Tr. at 40.

Plaintiff testified that she had headaches on a daily basis, which lasted from a couple of hours to all day.  Tr. at 41.  She indicated that she sometimes experienced vomiting and blurred vision with these headaches.  *Id.*

Plaintiff testified that she could stand for no more than 20 minutes at a time.  Tr. at 43.  Plaintiff indicated that she would need to lie down after alternating sitting and standing for 45 minutes to an hour.  *Id.*  Plaintiff indicated that she could walk for approximately 100 feet before having to stop.  *Id.*  She indicated that she was unable to walk on uneven surfaces.  *Id.*  Plaintiff indicated that she could lift a gallon of milk, but she did not indicate the maximum amount of weight that she could lift.  *Id.*  Plaintiff testified that she had difficulty when kneeling and bending.  Tr. at 44.

Plaintiff testified that she performed some household chores like washing dishes, loading the dishwasher, and cooking.  Tr. at 44–45.  Plaintiff indicated that she was able to vacuum, but that she took breaks when vacuuming.  Tr. at 45.

b.    Vocational Expert Testimony

Vocational Expert ("VE") J. Adger Brown, Jr., reviewed the record and testified at the hearing.  Tr. at 48–52.  The VE categorized Plaintiff's PRW as a deli clerk, Dictionary of Occupation Titles ("DOT") number 316.684-014, which was light with a specific vocational preparation ("SVP") of 2; an office clerk, DOT number 209.562-010,

which was light with a SVP of 3; a cashier checker, DOT number 211.462-014, which was light with a SVP of 3; a mobile home park manager, DOT number 186.167-018, which was light with a SVP of 5; and a nanny or child nurse, DOT number 302.667-010, which was medium with a SVP of 3. Tr. at 48. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work with only occasional climbing of ramps and stairs, balancing, and stooping; with no climbing of ladders, ropes, and scaffolds; with no kneeling, crouching, or crawling; and who would be limited mentally to performing only simple work with routine, repetitive tasks. Tr. at 49. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified jobs as a check cashier, DOT number 211.462-026, with 9,400 positions in South Carolina and 479,000 in the United States; an order clerk, DOT number 245.367-026, with 1,300 positions in South Carolina and 114,000 in the United States; and an administrative support worker, DOT number 249.587-014, with 450 positions in South Carolina and 44,000 in the United States. Tr. at 50. The ALJ then asked the VE to assume that the hypothetical individual could not sustain eight hours a day, 40 hours a week, week after week. *Id.* The ALJ asked if that eliminated work in a competitive environment. *Id.* The VE testified that it did. *Id.* The ALJ then asked if work would be eliminated if the individual had to lie down for a substantial part of the day, which was in excess of normal breaks. Tr. at 50–51. The VE testified that it would. Tr. at 51.

Plaintiff's attorney then questioned the VE.  Tr. at 51.  Plaintiff's attorney asked the VE to assume the facts from the first hypothetical, but to add that the worker would need to lie down for three to six hours during an eight-hour day and would need to alternate between sitting and standing every 15 minutes when not lying down.  *Id.* Plaintiff's attorney asked the VE if there were any jobs that exist in significant numbers in the national economy that the worker could perform.  *Id.*  The VE said "[n]o," and further indicated that either part of Plaintiff's attorney's hypothetical would preclude work.  *Id.*  Plaintiff's attorney then asked if an individual who would miss work on three or more days per month would be able to perform jobs at a competitive level.  Tr. at 51– 52.  The VE testified that such an individual would not.  Tr. at 52.

2.    The ALJ's Findings

In his decision dated June 18, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.
2.    The claimant has not engaged in substantial gainful activity since January 14, 2010, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: left knee injury post-surgery; degenerative disk disease; and post-accident chronic pain syndrome (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
4.    Hypothyroidism is a non-severe impairment under the Act and Regulations (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
5.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).
6.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with the ability to

15

do occasional climbing of ramps and stairs and balancing and stooping. The claimant cannot do work that requires climbing of ladders, ropes, scaffolds, kneeling, crouching, or crawling. The claimant has the ability to complete simple work that requires routine, repetitive tasks.

7. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

8. The claimant was born on May 15, 1969 and was 40 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from January 14, 2010, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

Tr. at 11–21.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     The ALJ failed to apply the appropriate standard in evaluating Plaintiff's pain under Social Security Ruling 03-2p;

2)     The ALJ failed to properly evaluate Plaintiff's ability to ambulate effectively under Listing 1.00B2B;

3)     The ALJ failed to follow the directives of Social Security Ruling 96-7p when assessing Plaintiff's credibility; and

4)    The ALJ erroneously concluded that Plaintiff was capable of sedentary work because he did not consider Plaintiff's testimony in which she indicated that she must spend 12 to 15 hours of the day in a reclined position and that her pain medications caused side effects.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982).  The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

19

supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Evaluation of Pain Under Social Security Ruling 03-2p

Plaintiff argues that the ALJ failed to apply the appropriate standard set forth in Social Security Ruling 03-2p[4] ("SSR 03-2p") in evaluating Plaintiff's pain.  [Entry #8 at 1, 4].  Plaintiff argues that the ALJ erred in failing to question Plaintiff about the intensity and duration of her pain.  [Entry #8 at 2].  Plaintiff further argues the ALJ erroneously evaluated Plaintiff's pain disorder under a mental disorder listing because there was no evidence that Plaintiff's pain was associated with psychological factors.  [Entry #10 at 1].

The Commissioner argues that SSR 03-2p directs that the ALJ compare specific findings to any pertinent Listing, and that the ALJ appropriately considered Plaintiff's

---

[4] Plaintiff refers to SSR 02-3p.  Defendant points out that SSR 02-3p does not exists and infers that Plaintiff was referring to SSR 03-2p.  Based on the argument set forth by Plaintiff and the language quoted in Plaintiff's brief, the undersigned also infers that Plaintiff was referring to SSR 03-2p.

psychological manifestations related to pain under Listing 12.04. [Entry # 9 at 8]. The Commissioner further argues that SSR 03-2p does not impose any obligation upon an adjudicator to ask specific questions about the intensity and duration of a claimant's pain. *Id.*

SSR 03-2p is a policy interpretation ruling intended to explain the policies of the Social Security Administration for developing and evaluating disability claims on the basis of Reflex Sympathetic Dystrophy Syndrome ("RSDS"), also known as Complex Regional Pain Syndrome, Type 1 ("CRPS").

According to SSR 03-2p,

[F]inding that RSDS/CRPS is a medically determinable impairment requires the presence of chronic pain and one or more clinically documented signs in the affected region . . . . [O]nce the disorder has been established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

The undersigned recommends a finding that the ALJ was not required to evaluate Plaintiff's impairment under SSR 03-2p because the medical evidence of record does not reflect that Plaintiff was diagnosed with or met the diagnostic criteria for RSDS/CRPS.

A diagnosis of RSDS/CRPS requires the presence of complaints of persistent, intense pain that results in impaired mobility of the affected region" and "are associated with: swelling; autonomic instability—seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), skin temperature changes, or abnormal pilomotor erection (gooseflesh); abnormal hair or nail growth (growth can be either

too slow or too fast); osteoporosis; or involuntary movements of the affected region of the initial injury.

SSR 03-2p.  The record reflects that Plaintiff complained of chronic pain and the ALJ acknowledged that Plaintiff had post-accident chronic pain syndrome.  *See* Tr. at 11. However, SSR 03-2p does not apply to chronic pain syndrome, but only to RSDS/CRPS. In fact, SSR 03-2p specifically provides that for RSDS/CRPS to be considered a medically determinable impairment it must be "documented by appropriate medical signs, symptoms, and laboratory findings" and it "may not be established on the basis of an individual's statement of symptoms alone."  The undersigned's review of the records for the time after Plaintiff's expected recovery period from the initial injury and surgery does not indicate the presence of the clinically-documented signs in the affected region that are required for a diagnosis of RSDS/CRPS.  While Plaintiff sustained an injury to her left leg and had limited mobility, her mobility improved over time.  Furthermore, the record does not indicate that Plaintiff experienced any of the specified additional requirements for the diagnosis, except for swelling, which was only documented at the first visit to Dr. Hunter after Plaintiff's surgery.  *See* Tr. at 318.

The undersigned interprets the ALJ's discussion of Listing 12.04 to be strictly an assessment of whether Plaintiff's major depressive disorder, as exacerbated by her chronic pain, met the requirements of Listing 12.04.  The ALJ indicated "[t]he severity of the claimant's post-accident chronic pain syndrome does not meet or medically equal the criteria of Listing 12.04."  Tr. at 12.  The undersigned does not read the ALJ's decision as indicating he is following the framework for evaluation under SSR 03-2p.  The

undersigned also notes that the ALJ does not indicate that he is analyzing Plaintiff's mental impairments based on SSR 03-2p.

Although the ALJ was not required to address all factors under SSR 03-2p, the undersigned acknowledges that there are significant similarities between the requirements of SSR 03-2p and the credibility determination under SSR 96-7, which the undersigned addresses below.

### 2.     Ability to Ambulate Effectively

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's ability to ambulate effectively under Listing 1.00B2B. [Entry #8 at 2]. Plaintiff indicates that the ALJ incorrectly quoted from the medical exhibits to provide justification for his determination. *Id.* Plaintiff further argues that this court must consider evidence in the record that supports the ALJ's decision as well as evidence that detracts from it. [Entry #10 at 3 referencing *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993)].

The Commissioner argues that Plaintiff failed to explain why the alleged error is significant and failed to show that her impairments would meet any of the remaining criteria for Listings 1.02 or 1.04. [Entry #9 at 9]. The Commissioner further argues that the ALJ's conclusion about Plaintiff's ability to bear weight was supported by the evidence that the ALJ cited in the record. [Entry #9 at 10].

At step three of the sequential evaluation, the Commissioner must determine whether the claimant has an impairment that meets or equals the requirements of one of the impairments listed in the regulations and is therefore presumptively disabled. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified

23

medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. § 404.1525(d). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. 20 C.F.R. § 404.1508. The Commissioner can also determine that the claimant's impairments are medically equivalent to a Listing, which occurs when an impairment is at least equal in severity and duration to the criteria of a Listing. 20 C.F.R. § 404.1526(a).

Under 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §1.00B2b(1), "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." The Listing goes on to state that "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. *Id.*

Listing 1.00B2b(2) provides:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to carry out routine ambulatory activities, such as shopping and

banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail . . . .

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §1.00B2b(2).

The ALJ concluded that Plaintiff's impairments did not meet Listings 1.02 and 1.04. Tr. at 12. The ALJ wrote "[t]he medical evidence shows that she retained the ability to bear her weight (Exhibit 3F/78)." *Id.*

The undersigned recommends a finding that the ALJ properly evaluated Plaintiff's ability to ambulate effectively under Listing 1.00B2b and concluded that Plaintiff was able to ambulate effectively. The ALJ specifically cited to a record from Dr. Bozorgnia dated April 12, 2010, which indicated that Plaintiff was weightbearing with no significant complaints and in which Dr. Bozorgnia indicated that Plaintiff could continue weightbearing as tolerated. Tr. at 438.

In light of Plaintiff's argument that the ALJ picked out evidence to support his theory that Plaintiff could effectively ambulate and ignored evidence to the contrary, the undersigned has reviewed the entire record and recommends a finding that the ALJ's conclusion that Plaintiff was able to ambulate effectively was supported by the record as a whole. After the date referenced by the ALJ, Plaintiff had surgery to repair her ACL and MCL and ambulated with bilateral crutches. *See* Tr. at 327, 396, 398–402. However, records from Plaintiff's physical therapy treatment indicate that while Plaintiff sometimes wore a hinged knee brace, the physical therapist still described her ambulation as independent after June 11, 2010. *See* Tr. at 385–95, 536–48, 552–62. The latest reference in the medical record to Plaintiff using any type of assistive device other than

the hinged knee brace to ambulate was on August 30, 2010, when Dr. Whitley noted that Plaintiff "came to the evaluation room using crutches with an injured left leg." *See* Tr. at 499. Plaintiff's last physical therapy appointment documented in the record was on December 15, 2010, and Plaintiff was described as ambulating independently into the clinic. *See* Tr. at 537. The record reflects that Plaintiff last complained of "foot pain" during an office visit with Dr. Ayers on February 18, 2011, approximately 14 months before her hearing. *See* Tr. at 580. Dr. Ayers noted no impairment to Plaintiff's ability to ambulate. *See* Tr. at 580–81. The final medical record in the file was from Plaintiff's hospitalization for appendicitis in January 2012, when Plaintiff was described as independent in activities of daily living and her fall risk was indicated to be "low." *See* Tr. at 638. In fact, the only evidence in the record that supports any notion that Plaintiff was unable to ambulate effectively at any point after August 2010 was Plaintiff's testimony. Therefore, substantial evidence in the record supports the ALJ's conclusion that Plaintiff was able to ambulate effectively under Listing 1.00B2B.

Because the undersigned recommends a finding that the ALJ properly evaluated Plaintiff's ability to ambulate under Listing 1.00B2B in reaching his conclusion that Plaintiff's impairments did not meet or equal Listings 1.02 and 1.04, the undersigned declines to address the Commissioner's argument that Plaintiff would need to meet all of the specified criteria under Listings 1.02 and 1.04.

### 3. Social Security Ruling 96-7p

Plaintiff argues that the ALJ did not comply with the requirements of Social Security Ruling 96-7p ("SSR 96-7p") when assessing Plaintiff's credibility. [Entry #8 at

2].   Plaintiff argues that the ALJ made a conclusory statement about Plaintiff's credibility, that he did not support with specific evidence in the case record.  [Entry #8 at 3].

The Commissioner argues that the ALJ complied with the requirements of SSR 96-7p because he explained the extent to which the evidence was consistent with Plaintiff's alleged limitations and the extent to which it was not.  [Entry #9 at 11].

SSR 96-7p provides the following guidance to ALJs tasked with assessing the credibility of claimants' statements:

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of the objective medical evidence.

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists about the symptoms and how they affect the individual, and any other relevant evidence in the case record.  An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

27

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The provisions of 20 C.F.R. §§ 404.1529(c) and 416.929(c) set forth the following factors that the ALJ must consider in addition to the objective evidence when assessing a claimant's credibility:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate or aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 or 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p.

When determining the credibility of a claimant's statements, the ALJ is not required to either accept or reject them.  *Id.*  The ALJ can find that that the claimant's statements are fully credible, partially credible, or incredible.  *Id.*  The ALJ can find that the claimant's statements are credible to a certain degree or that some allegations are credible and others are incredible.  *Id.*

The ALJ indicated that "the medical evidence of the claimant's post-accident chronic pain syndrome is consistent with the conclusion that the claimant cannot work at more than the sedentary level of exertion, as the medical evidence is consistent with the conclusion that the claimant's impairments will reduce her residual functional capacity to where she cannot stand or walk more than occasionally." Tr. at 17. The ALJ proceeded to discuss specific medical records supporting that conclusion. *Id.* The ALJ then stated "[t]he medical evidence of the claimant's degenerative disk disease is consistent with the conclusion that the claimant's back and lumbosacral pains reduces her residual functional capacity to frequently lift only 10 pounds." *Id.* The ALJ again proceeded to discuss the evidence and explain his rationale in reaching that conclusion. *Id.* The ALJ next concluded "that she retains the residual functional capacity to occasionally climb ramps and stairs, balance, and stoop," and proceeded to explain how this determination was supported in the record. Tr. at 18. The ALJ found "that her residual functional capacity is reduced to where she should never climb ladders, ropes, scaffolds, kneeling, crouching, or crawling," and proceeded to explain how the evidence supported that conclusion. *Id.* Finally, the ALJ found that "the claimant has the ability to complete simple work that requires routine, repetitive tasks," and discussed how the record supported that conclusion. *Id.*

The undersigned recommends a finding that the ALJ addressed each of the factors set forth in SSR 96-7p and 20 C.F.R. §§ 404.1529(c) and 416.929(c). When explaining his conclusion that Plaintiff had moderate restriction of activities of daily living, the ALJ indicated that he considered Plaintiff's testimony indicating that she took naps during the

day and used her walker to get around her home.  Tr. at 12.  He further indicated that the medical evidence supported the conclusion that heel pain, neck pain, back pain, and left quad atrophy would cause Plaintiff to experience constant pain and reduce her ability to do various activities of daily living.  *Id.*  The ALJ acknowledged Plaintiff's indications that she experienced panic attacks when people were around and had increased pain when exposed to cold.  Tr. at 14.  The ALJ indicated that Plaintiff had testified that her medications caused her to feel sleepy, drowsy, and caused frequent urination.  *Id.*  He specifically recognized Plaintiff's indication that she spent 12 to 15 hours per day reclining or sleeping.  *Id.*  The ALJ specifically cited each of these factors and considered them in making his determination that Plaintiff's testimony was partially credible.

The undersigned recommends a finding that the ALJ's conclusion regarding Plaintiff's credibility was supported by substantial evidence and that his decision contained specific reasons for the finding on credibility, supported by the evidence in the case record, and was sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.  The ALJ's decision specifically states "the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment."  A review of the ALJ's decision indicates that the ALJ found that Plaintiff's statements were credible to a certain degree, but not fully credible.  The ALJ adequately explained why he reached the

conclusions that he reached regarding Plaintiff's limitations and how the medical evidence supported some of Plaintiff's indications and failed to support her other allegations. *See* Tr. at 16–18. For example, the ALJ indicated that the medical evidence of Plaintiff's post-accident chronic pain syndrome was consistent with the conclusion that she experienced significant pain, but that the medical evidence showed that she retained the ability to bear her weight. See Tr. at 17. As another example, the ALJ concluded that the medical evidence was consistent with the conclusion that Plaintiff's pain reduced her ability to lift and carry, but that the objective evidence indicating the functionality that Plaintiff retained in her back did not support Plaintiff's testimony that she could not lift or carry 10 pounds. Tr. at 17–18. The ALJ also explained that his conclusion that Plaintiff had the ability to complete simple work that required routine, repetitive tasks was supported by her retained ability to prepare simple meals, manage her funds, and interact with the public, as Plaintiff reported to Dr. Whitley. *See* Tr. at 18. The ALJ also explained why he accorded the weight that he accorded to particular medical opinions within the record and why he found greater restrictions that those found by the state agency psychological consultant based on claimant's indications during the psychological consultative examination. *See* Tr. at 19.

Plaintiff argues that the ALJ erred in failing to obtain additional evidence to assess Plaintiff's statements about symptoms and their effects. [Entry #8 at 3]. SSR 96-7 indicates that the ALJ "must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements" when additional information is needed to assess a claimant's credibility. However, Plaintiff does not

allege that there is other available information that the ALJ could have obtained in order to shed light on the credibility of Plaintiff's statements.  If there were some indication in the record that additional evidence was available regarding Plaintiff's credibility and that the ALJ failed to secure it, this may be a valid argument.  However, the law does not require the ALJ to go on a fishing expedition in an attempt to find information to make Plaintiff appear more credible.  Plaintiff's interpretation contemplates much more than a "reasonable effort" on the part of the ALJ.  Therefore, the undersigned recommends a finding that the ALJ did not err in failing to obtain additional information that could shed light on the credibility of Plaintiff's statements where Plaintiff can point to no specific information that the ALJ failed to obtain.

4.      Plaintiff's Testimony

Plaintiff argues that the ALJ failed to consider Plaintiff's testimony that she spent 12 to 15 hours per day in a reclined position due to pain.  [Entry #8 at 4].  Plaintiff argues that this error resulted in the ALJ's erroneous conclusion that Plaintiff was limited to sedentary work.  [Entry #8 at 3].  Plaintiff also argues that the ALJ failed to consider her testimony regarding side effects of prescribed medications.  *Id.*

Plaintiff refers the court to the following language from Social Security Ruling 96-9p:

> In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals.  If an individual is unable to sit for a total of 6 hours in an 8-hour workday, the unskilled sedentary occupational base will be eroded. . . .

> An individual may need to alternate the required sitting of sedentary work by standing (and possibly, walking) periodically. Where this needed cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. . . .

The Commissioner argues that the ALJ considered Plaintiff's testimony that she spent 12 to 15 hours per day in a reclined position, but explained why he nevertheless found that Plaintiff was capable of both sitting and standing/walking at a sedentary level of exertion. [Entry #9 at 13] *citing* Tr. at 14, 17–19. The Commissioner argues that the ALJ also considered the side effects of medications that Plaintiff alleged in her testimony, but chose not to credit that portion of her testimony. [Entry #9 at 14]. The Commissioner further argues that the Plaintiff failed to indicate how consideration of the alleged side effects of medication use would have made a difference in the ALJ's conclusion. *Id.*

The undersigned recommends a finding that the ALJ considered Plaintiff's testimony as required under SSR 96-7p and 20 C.F.R. §§ 404.1529(c) and 416.929(c). While SSR 96-9p indicates that the limitations set forth by Plaintiff in her testimony would not be consistent with the performance of sedentary work, the ALJ found that portion of Plaintiff's testimony to be incredible and properly explained his reasons for reaching that conclusion.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and

law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

September 15, 2014
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).